We'll hear the first case, Christiansen. Good morning, your honors. May it please the court, my name is Susan Hanna-Lask for Matthew Christiansen, the appellant. Today I'm here to reconcile Simonton from 2000. When I look at the cases, your honors, obviously Simonton was in 2000 and was based on a test of literally sexual activity and it appears to me that, well, the case is clear to me, that it actually carved out a group of people based on their sexual activity that do not get protection under Title VII. But Title VII, the spirit of it, is about skills, not who you sleep with, not who you love. I can't reconcile, and I don't think the circuit court can do the same, to reconcile Simonton with Lawrence v. Texas in 2003, three years later, that said, wait a minute, we can't put people in jail because of who they're sleeping with, because of their sexual activity. Can you prevail if Simonton is not overturned? No, your honor. You're calling for the court to overturn Simonton, which can only be done through an in-bank proceeding? Yes, your honor. Simonton has to be overturned, it has to be vacated. It's, I mean, it's doesn't make sense considering even the EEOC's Baldwin case, which gives us plenty of information, and I'll let the EEOC handle that in her argument. It doesn't reconcile with the latest district courts of Boutillier in this circuit. There are, there are, oh, I'm sorry. But below, I took you to be making both a sexual orientation claim and a sexual stereotyping claim. So you are now abandoning the sexual stereotyping claim? Because I read the district court to have said that that wasn't adequately pled. The district court did say it was not adequately pled. I don't want to abandon the sexual stereotyping claim at all. No, I don't. I would definitely focus on the sexual orientation claim here today because of Simonton. I can't, I need to get past that, and I think the circuit has to as well. There are a variety, as you know, of different theories. One says that discrimination on the basis of sexual orientation treats employees less favorably because of their sex and is thus discrimination. A second says that discrimination on the basis of sexual orientation treats employees less favorably based on sex of their associates, social relationships, and thus is sexual discrimination. Then there's a third that says this is discrimination on the basis of stereotypes. Is there one of these, two of these, all of these that you embrace? Is there one in particular that now as you stand before us that you embrace? I would like to give the court a test, a but-for test that I think embraces one and two, which would be, and like Boutelier, and I apologize if I mispronounce it, says the problem here is the target is the sex. So the test would be but for the sex of the employee, and we'll take number two, and the sex of who he associates with, that they are being discriminated in this manner, which again my position is violates the spirit of Title VII because it's not about sex, per se, the sexual activity. It's about skills. So it doesn't matter who you slept with last night as long as your skills are good because when we go in, well, I'll stick with the question. It's a but for the sex of the employee and but for the person he associates with, and it's the same as, Your Honors, in Holcomb where this court resolved racial discrimination. Interracial couples get protection. Why not intrasexual couples get protection? So your position is with the EEOC that sexual orientation discrimination is of necessity sex discrimination or because of sex for the purposes of Title VII. Am I understanding the argument? That in all cases of sexual orientation discrimination, that discrimination is of necessity discrimination because of sex. Because of sex. It's the first thing that is targeted. I just raised my hand as an illustration. The left hand here is our employee. He is not heterosexual and that's why I'm here today. It's to protect the people that happen to not be heterosexual because Simonton only protects people that are heterosexual. So here's our employee who's not heterosexual. Here's our employer, harasser, whatever we want to call them, and he's seeing a male. That's the first thing you see. And then we'll bounce back to here and his mind starts calculating saying that male should be with women, but because he has a picture of his husband on the desk, I want him out. I'm going to harass him. I'm going to do what Simonton warned us in the beginning of its case. Be careful because we're going to tell you facts and we're not even going to tell you all the facts. Something so reprehensible, you're not going to like what you read. And then we read about the pictures and the lewdness and what Mr. Simonton went through that led him to a heart attack even. Your Honors, when I read the 110th congressional record, it was all about skill. Nobody was talking about sex or who you love. It's all about skill. And it also said, and I'll get back to Simonton and his family, they also say on that floor in the 110th record, nobody should be afraid for their life when they go to work. Simonton almost died. Many people probably, who knows who's committing suicide? Well, maybe they are, all these people jumping off the George Washington Bridge because they can't keep their jobs. The congressional record with respect to sex is not very extensive. It's not very clear at the time of the passage of that law. Indeed, as you know, it was proposed with respect to sex as a way of defeating the whole measure. And it didn't happen. The measure passed. But the legislative history is quite sparse, which may in part explain why for a very long time, rightly or wrongly, circuit courts and the EEOC were of the view that sexual orientation was not covered. Just trying to understand how we got to where we are, which is not to say that decides what we decide right now. Your Honor, with all due respect, let me correct you. First of all, there's a lot of fallacies. The first thing I did when I got this case, when I was writing my brief, I said, someone get me that congressional record. Because we read, and you just happened to repeat, what I would say is a fallacy. Senator Smith from Virginia did not bring it up as a joke. In fact, he says I'm very serious. Let's add sex. And they had a debate with the female senators. I'm sorry, congresspersons, congressmen and women. And it wasn't a joke. But for some reason ... I'm not saying it was a joke. I'm just saying that the legislative history itself is sparse. Which is not to say that your position is not defensible. I'm not saying that at all. I'm just trying to get a sense of how we got there and how we go from there to here. On call tells us ... On call is supportive of your case. On call, and Justice Scalia says that statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils. And your position would be that sexual orientation discrimination would be that kind of comparable evil. Yes. It would be covered. Because a lot of the Supreme Court cases tell us it's better to go general, go broad, and protect. Because Title VII is a protection statute to protect employees based on skill again. And I guess you also have Price Waterhouse. Yes, your honor. Could you explain how Price Waterhouse helps you? Price Waterhouse was the woman who was too manly. She happened to be ... I think she was heterosexual, actually, but she was too manly. And Price Waterhouse, of course, says sexual stereotyping gets protection. And then this court, after Simonton, came up with, in Dawson v. Bumble v. Bumble, sexual stereotyping. Let's not blur the lines. Let's not bootstrap homosexuality to sexual stereotyping. Your honor, of course the lines are blurred. How can you possibly say a heterosexual female like Price Waterhouse, who's somewhat manly, aggressive, whatever, gets protection because she's heterosexual, but the same woman would not get protection if she was a lesbian? The lines do blur, so why carve them out? It blurs for a reason, because we're all men and women, first and foremost. Matthew Christensen is a man. He doesn't meet people and say, hello, my name is Matthew Christensen. I'm a gay man. He didn't put that on his job application either. And we also don't have on our passports or our licenses, male, female, gay, straight. We're men and women, first and foremost, and the purpose is skills. We're here for skills in Title VII. Counsel, is there an argument to be made that sexual orientation is, in fact, just a form of sexual stereotyping, and therefore it fits under the coverage of Title VII? Does Price Waterhouse help you with that, or any of the other Supreme Court decisions? Your honor, the way I see this sexual stereotyping thing is really just social norms, social graces. That's actually how I see it. I don't personally, in my mind, believe that we should have a sexual stereotyping. I still say that if... I understand that's your thought, but the Supreme Court has said sexual stereotyping is covered under Title VII. So my question to you is, is there an argument to be made that sexual orientation is just a form of sexual stereotyping? Sexual orientation, yes, your honor. I would say sexual orientation is a form of it, because they're saying, even in Dawson, that it's so blurred. They can't segregate sexual stereotyping from the homosexuality. So why not take that group and keep it together and say, if sexual stereotyping, if you're heterosexual or a homosexual, you get... Sexual stereotyping, in my mind, your honor, I'm sorry, I can't reconcile that. It shouldn't exist. If you're sexual stereotyped because you're a heterosexual female, acting male, you get the protection. But if you're a homosexual female, you don't get the protection. It needs to... It's blurred. And it's your position, just making sure I understand. So you could prevail if we were to reexamine our precedent in Symington and Dawson. This panel may or may not have the authority to do that on its own, but that's one way. But even apart from that, you're enough here, there were enough allegations of sexual stereotyping that the district court erred in dismissing it under that precedent, in dismissing the claim under that precedent. Am I being clear? The district court, in my case, erred, yes. Yeah. I mean, because I read the complaint. There were allegations that the plaintiff's... The supervisor was saying the plaintiff's exhibition of behavior, quote, was stereotypically inappropriate for men. The supervisor had acted against him on that basis. This muscled beach poster, there may be a reading within our precedent that would afford your client some relief. Yes, Your Honor. Can I, though, also ask you about the statute of limitations in this case? So the incidents in the complaint are alleged to have occurred between 2011 and 2013, and then there is the Facebook post in September 2014. You're arguing that that's sufficient to bring this within the continuing violation theory. Could you help me out with that a little bit? Sure, Your Honor. The Facebook post, well, the four corners of the complaint, he discovered it in 2014. We immediately wrote them letters and said, enough already. You know, it's bad enough what he was going through and being, you know, called all these names and accused of having AIDS and this and that, but now you have him up and, you know, with his legs in the air in that bikini shot on the poster. Take it down. They wouldn't take it down. They wouldn't take it down, which was more of their kind of, it's in your face, there you go, we're going to keep making fun of you. It took us to write to the EEOC, which was well within 300 days. So September, it was discovered. If we were wrong about that poster, after the EEOC got involved, that poster went down January 2015. It was on Facebook. How does it connect would be your thought process, and the law obviously is the last act should connect to the previous acts. And of course it does, because it was a sexual, it has him in the, I say it in my brief many times, the sissy position, the bottom, the poof, all of these sexual denigrations that Mr. Cianciotta was using against him, now we have him in that poster. And your honors, I'll make it one further point clear, the gay males, employees of that, and every one of them certified that yes, as a gay male, that is definitely the position of a gay man in the sexual position. So counsel, your argument as to what the discriminatory act is with regard to that poster is the fact that the company refused to take it down, or refused to order the supervisor to take it down, as opposed to the posting of the act? No, the posting of the act, oh yes, the posting of the act, but the discovery of it, and that is the law upon discovery, which Matthew discovered it in 2014, and we wrote them, so it goes further, and then they refused, then the act went further, then they refused to take it down for another four months, when we explain this is connected to all of the sexual discrimination, the sexual orientation discrimination that you've been putting Matt through for years, please take this down, he doesn't- My question to you with regard to the posting is, that was posted on the private Facebook page of the supervisor, are we to assume that the employer knew about it, and therefore had an obligation to order the supervisor to take it down, or is your argument really as to the employer, that they can't be liable until a demand is made for its removal, and even so, are we saying that an employee who posts on his personal Facebook page, that the employer is therefore liable because they did something outside of the work, and does that sever the connection between the act itself of posting it by the employee outside the workplace, and make it dissimilar or not connected sufficiently to all of that discriminatory conduct that happened in the workplace that is past the statute of limitations time period? A lot of questions, Your Honor. Thank you. And what I will tell you is, factually, again, in the four corners of the complaint, that poster wasn't on his private Facebook alone, what he did is he tagged hundreds of people, including Mr. Christensen's accounts, who were in the service, like State Farm, you know, that he was managing, and other people. It wasn't private. It was very public, and it went beyond the work to embarrass him, and Mr. Christensen, at the time, and we explain it, he put Matthew's name on it, too, but Matthew never got notice of it. Facebook didn't have tagging at the time, notifications. I can't stand Facebook. I try to stay away from it, but you, this is what he, Matthew did not know that poster was up until he discovered it in September 2014, which I'm arguing with that counsel. My question is really directed at what is the employer's responsibility if an employee outside of the workplace is engaged in conduct that is harassing to an employee? Are you arguing that they have liability because the employer's policy speaks to the employee's conduct outside the workplace on social media? What is the connection? The employer's policy did, and we allege that the handbook told them that they weren't allowed to do that anyhow. They shouldn't put work-related things or anything about the employees up on social media, but again, on this issue, it was the poster that was up in a sexually offensive manner that connects to all of the other prior sexual... The difficulty I have with the continuing violation theory, so the harassment, and correct me if I'm misunderstanding the complaint, the harassment in the workplace, so far as the complaint alleges, ends in 2013. The Facebook posting is discovered in 2014. From the way you're articulating the theory today, it could have been 2020 or 2025, and you'd still say it was a continuing violation, and that seems to me to do away with the statute of limitations. So what am I misunderstanding? Your Honor, it was in 2020. I don't see any law that says if it was in 2020. The law is upon discovery, first of all, and he alleges it. It was within the year of the last... Well, when he reasonably should have discovered it, right? No, not at all. How am I to know who's putting up pictures of me on a naked body or somewhere else? The district court didn't consider the continuing violation. Yes, I was going to get that. Because it essentially resolved the case on the failure to state a claim under Title VII, and in the normal course, the Court of Appeals doesn't decide this kind of issue. It's the district court that gets the first crack at it. And they didn't because it wasn't raised in the district court, and I explained that in my reply brief. It was never raised. So I guess my point is that if we get to that point, it might be better for our process to remand to the district court to consider these issues in the first instance. It's a possibility, yes. You'll have three minutes in rebuttal. Thank you, Your Honor. Good morning. May it please the Court, my name is Howard Rubin, and I'm here on behalf of... How are we going to do the order here? Oh, I'm sorry, the EOC. My mistake. I apologize. I was so ready to go. If you want to argue in support of your adversary's position... May it please the Court, Barbara Sloan for the EEOC. We're here to urge the Court to revisit Symington and Dawson and to reinterpret sex to include sexual orientation. Right now, the Court has carved out a giant hole in the definition of sex and the definition of sex. We don't think that has turned out to be very workable, or is it legally supportable? The position that you're asking us to change, just in my way of context, is a position that was a position that the EEOC itself had not disagreed with. Yes, it is. That's correct, Your Honor. But we recognize that the legal landscape has changed and the understanding of sex and sex orientation has evolved over time. And so it's appropriate that we also evolve our definition and make it encompass sexual orientation. And Baldwin laid out three, as the Court mentioned, Baldwin laid out three theories under which sexual orientation would be considered sex discrimination. The Price-Waterhouse sex stereotyping, the Holcomb associational theory, and then pure and simple disparate treatment, where the employer treats someone differently than someone else who is essentially identical except for, for example, the sex of the individual's spouse. In practice, what does your interpretation look like? Do plaintiffs need to plead one or more of these three particular theories, or do they just have to plead employment discrimination based on sexual orientation? I think if they plead discrimination based on sex and or discrimination based on sexual orientation, that should do it, because under the Supreme Court's case, and I think it's called Switzer or something like that, you don't have to plead a theory, you just have to plead facts that support a theory. So assuming there are sufficient facts to support coverage, that's all you have to have. I think the Court asked whether there are, whether sex stereotyping is always equal to sexual orientation. And I think that, we think that the underlying understanding of sex stereotyping, as the Hively panel said before that decision was vacated, the quintessential sex stereotyping is opposite sex attraction. Men will be attracted to men, to women, and women will be attracted to men. So basically, under Price Waterhouse's sex stereotyping theory, sexual orientation discrimination is virtually always, if not always, sex discrimination. I hope that answers that question. Just so I understand, one of the amicus briefs says that the Baldwin decision is entitled to Chevron deference, as I read it, but the EOC is not claiming Chevron deference, right? It's Skidmore deference, is that right? We're not asking for any particular type of deference at all, Your Honor. We think that, plaintiffs mentioned Edelman. We hope that the Court will go there and say, well, the EOC's decision is correct. It's not that it's a reasonable interpretation of a whole in the statute, it's the right interpretation of the statute. We hope the Court will find it persuasive for that reason. We're not asking for the Court to decide any particular level of deference to the decision. It's a correct reading of the statute, in our view. In our view, all three of those provision of theory sort of boil down to the same thing, which is that if the employer is taking sex into account, that's sex discrimination, and an employer can't take sex into account. I mean, excuse me, the employer necessarily takes sex into account when it discriminates based on sexual orientation. Because you can't, I mean, sexual orientation to a person is defined by their own sex and the sex of the person that they're attracted to. So, under Price-Waterhouse, you, an employer, is prohibited from taking sex into account. So, the employer is prohibited from discriminating based on sexual orientation. Okay. In the brief a couple of times that discrimination on the basis of sexual orientation is necessarily sex discrimination, and today you said that sexual stereotyping is almost invariably or invariably, and I think we may be thinking about the same space. Okay. So, I understand your argument with regard to sexual stereotyping and the confusion in the case law. I'm having difficulty with the argument that in all cases, sexual orientation discrimination is discrimination because of sex, and maybe it's the focus of what if the gay people, men and women, I won't hire any of them, that's a form of discrimination. How is that because of sex as opposed to sexual orientation? Well, that sort of flows into the associational theory, Your Honor, because an employer who discriminates against, or which I guess all sort of folks goes back to Loving v. Virginia, you if an employer discriminates and says, I'm discriminating against black people who are married to white people, I'm discriminating against white people who are married to black people, I'm discriminating against Native Americans who are married to Hispanics because I don't believe in interracial marriage. That is discrimination based on race. Even though you're treating everyone equally, what are you doing? You're taking race into account, and you can't do that under Title VII. So, it's not on the stereotyping theory. It's on the associational theory. Right. Well, because they all boil down to the employer is not permitted to take a protected characteristic into account in making employment decisions. What do we make of the fact that Congress has not acted, that it's been 16 years, for example, since Simonton? What do we make of congressional inaction, if anything? I think you shouldn't make very much of it, Your Honor, because legislatures do or don't do things for all kinds of reasons, and we just don't know what they are. And I thought it was interesting this morning. I thought, you know, there are three appellate decisions holding that transgender discrimination is covered by Title VII. It's discrimination based on sex, and Congress hasn't done anything with that either. And that's been since 2000. So, I think Congress isn't acting on this. It's just we don't know why it hasn't. Maybe it's because the statute, as it currently should be understood, covers sexual orientation. There's no need for additional legislation. And sometimes, even if there is a statutory proposal, it's lodged in with a bill that has other elements to it that where members of Congress may vote against that larger provision. Exactly. Even if they have no problem with the particular provision having to do with sexual orientation. Exactly, Your Honor. And we don't know. We suppose that may well be what's happening here. I see my time is up. We hope that the Court will revisit Simonton. Thank you. Okay. I think it's my turn now. Sorry, I jumped up before. I'm still Howard Rubin, and I represent all the defendants except for Mr. Cinciotta. To us, the facts that matter at this appeal are pretty simple. The plaintiff complained for the first time about being harassed in June of 2013. He complained about only one person, Mr. Cinciotta. The company immediately made Mr. Cinciotta get up and publicly apologize to everybody. The president of the company got up and gave a speech that they would not tolerate this behavior. That was in July of 2013. There have been no complaints after that. We're now in 2017. There hasn't been a single other complaint. The plaintiff is still at the company working just fine. Mr. Cinciotta has been gone since 2015. And the plaintiff has also simultaneously filed a case in state court pursuing the exact same facts and the exact same remedies. In fact, city law provides for more remedies, pursuing that case at the same time. What about the request to take down the Muscle Beach poster? Well, first of all, that Muscle Beach poster is on a private website of an individual, as you indicated. It's not on any company website. Second of all, the facts show that the demand that they're alleging was never reached to any company officials. Some people hadn't even started yet. One of the people had not even started at the company yet, and the other one, there was a wrong email address. So they never got that demand. When it finally came up later, they did have the person take it down. But using the defamation analogy, which we use in terms of the single publication rule, there are defamation cases, including — I have trouble pronouncing this — Koliarsky, which is a New York State Supreme Court case in which there was a demand for a retraction. And the court said, no, the single publication rule in New York, under New York law, very clear, undisputed, and it applies to the Internet, the demand for a retraction, or you might say a takedown, does not start the statute of limitations again, and it's not any additional harassment. But assuming that Plink Appellant here has pled a hostile work environment claim based on the conduct that happened prior to 2013, is it your argument that this Muscle Beach poster, if posted by an employee against your policy, does not continue that harassment? Well, there's no dispute about the fact that it was posted in 2011. Regardless of when it's posted, assuming that Appellant only learned of it in 2014, and therefore it's within the statutory time period, the statute of limitations time period, is it your argument that the post-in of that Muscle Beach poster, when discovered by Appellant, doesn't continue the harassment that he faced from 2011 to 2013? Yes. The discovery of the poster is irrelevant when he discovered it. The statute of limitations runs from when the act was done. The act was done by the defendant in 2013. How can it be a harassing act to this employee if he doesn't know of it? Doesn't it make sense that he learned of it in 2014, it's harassing to him, that it's arguably a continuation? I don't believe that it matters when he discovered it. Yes, I totally agree it's not harassing to him until he finds out about it. But it's not an act that the defendant can be held responsible for within the statute of limitations. But isn't it a continuing policy of discrimination? And I don't see how it's a continuing policy. Well, do you disagree that that Muscle Beach poster and everything that it represents is sufficiently related to the conduct that Appellant complained of from 2011 to 2013? Yes, but- Yes, it's related or not? Yes, it's related. I would not think, and although we're not here to argue the merits of the poster, I do not believe that the poster is an act of harassment if you look at the poster. But that's not the point here. It's been alleged to be and we're not here to argue about that. However, that poster was an invitation to a happy hour. It is admitted in the complaint on page 16 to 17, paragraph 34D, that it was sent out by email to the record. There's an email in which that poster, again, was an invitation to the whole agency to a happy hour. There's no dispute that he knew of it when it was circulated in the office. The question is really, does the act, your employee posting that poster subsequent to the circulation- It was posted at the same time as the circulation. Regardless of when it's posted, except in the allegations of Appellant is true, as we're In fact, he didn't discover it until 2014 and you agree that the conduct is similar to the prior conduct. Why isn't it part of the continuing violation here? I would say it's exactly the same thing as the single publication rule under defamation. If the person discovers a defamatory article a year after it was written, the statute of limitations is run. He discovers it for the first time, it's causing him harm at that time, but that defamatory article went on without question under New York State law and under this court's decision about things posted on the internet. There was the first case by the New York Court of Appeals that applied the single publication rule to the internet, and then this court in 2003 in von Buskirk said it applies the same way. The single publication rule applies to something posted on the internet and doesn't matter when it's discovered. The act that we're responsible for occurred in 2011. Now, just to be clear, as I understand it, as I noted earlier, with respect to the time bar arguments, there are two that you are making, the continuing violation and the equitable tolling. As to both, the district court did not resolve those issues. If we were to get to this point, get beyond the Title VII issue, as to continuing violation and equitable tolling, the normal course would be to remand to the district court for its consideration of those issues. You say with respect to the equitable tolling issue, you say that the district court, this is on page 25 of your brief, you say that the district court rejected Christensen's equitable tolling claim, but when I look at the district court's decision in the appendix 154, the district court says it need not decide this issue, however, as plaintiff's disability discrimination claim fails on the merits. So, the district court didn't resolve equitable tolling, didn't resolve continuing violation. Why shouldn't it just go back to the district court if we get past the Title VII? Well, first let me say that absolutely, positively, we raised this issue below. It's on page 11 of our brief on the motion to dismiss and is argued in our report. The question is whether the district court addressed, I understand that you raised it. Well, that was said that we didn't and I wanted to be clear about that and as you honors know better than I, this court can affirm on any basis that was raised below if you decide to do so and decide that you don't want to tackle the big issue of overturning assignment and you could affirm this on the basis of the statute of limitations if you so chose. Even if we agreed with you about the continuing violation doctrine, the equitable tolling decision that the district court did not make, I agree with my colleague, wouldn't that require a remand for factual development? Well, the district court, I guess, didn't ultimately decide that but did basically say what she thought about it. She literally said, in light of plaintiff's ability to both continue working and at such a high level as to receive her promotion and to lodge a complaint with human resources during the very period for which she claims a limitation period should be told, plaintiff's case is easily distinguishable from the case law on which she relies. So she said very clearly where she stood on that even though ultimately she dismissed it on the basis of other grounds and she didn't address it as to Title VII because she dismissed it obviously on the basis of the Second Circuit precedent. So she didn't reach it on Title VII but the facts on equitable tolling would be the same for both of the issues. So I suppose, yes, you could remand it back. We feel pretty comfortable as to where the district court would come out on that if that's the way you decide to proceed with this case. You tried to distinguish Mandicino. Mandicino, though, as I read it, says it's improper to in opportunity to present evidence about why he was impaired despite the competing facts. Why isn't this case just like Mandicino in that regard? Because exactly the reason that the district court said, Your Honor. All of the allegations on which the district court discussed why she felt about equitable tolling come right out of the complaint. The fact that he worked productively that whole time, was promoted, that he actually did complain within the company during that period of time, all of that's right out of the complaint. You can't create, Mandicino has disputed facts. You can't create disputed facts by things that you say afterwards. They got an analysis from a doctor in 2015 which basically proves that you can pay a doctor to say anything, that he was unable to complain for psychological reasons during the very time that he actually did complain. So I think the difference there between our case and the other ones that she cited as the court said was that these facts come straight out of the complaint and you can rely on nothing more than the facts in the complaint to see that there's no equitable tolling here under either statute, under Title VII or under the ADA. Thank you. No, no. Oh, sorry. Same problem in reverse. There's a lot of people around here. So my name's Rick Ostrove and I represent JOSI in Seattle and I just want to start off by saying that my client denies that he discriminated or that he had any intent to discriminate on the basis of sexual orientation, sex stereotyping or otherwise. Can I ask you, sir, you, as I read what you, your brief, you incorporate the defendant's brief from the Seventh Circuit's Hively case, correct? Yes. And that brief argues that Title VII does not prohibit sexual orientation discrimination. Yes. My question to you is this. If discriminating against an interracial couple is racial discrimination under Holcomb, why wouldn't discriminating against the same sex couple also be sex discrimination? Well, I would respond to that by saying that in this complaint, I don't think there is any allegation on the face of the complaint that Mr. Christensen was involved in a relationship or associated with somebody else of his sex. Does that matter? I think it does because it's not in the complaint. If you're making an associational claim in a race case that you are being discriminated against because you're married to someone of an opposite race, you would probably have to put that in the complaint. And I don't think that that allegation exists in this case, in this complaint. Well, let me put it to you this way. Do you object to applying the associational theory to sex discrimination generally? Or do you only object to applying it to certain kinds of associations, like romantic associations between people of the same sex? I am not sure because I don't think that is something that exists or was alleged in this case. I do want to point out, though, because something that's getting lost in this shuffle and that shouldn't be lost in this shuffle is that in this case, there are five alleged acts. Three of the alleged acts are depictions. And if you look at these depictions, and I dispute that the Muscle Beach poster is related on a continuing violation theory to the other four alleged acts that occurred over a two to three year period, by the way, which would never satisfy severe or pervasive tests, if you ever look at that. But when you look at these depictions, which are three of the five acts that are alleged here, are they silly? Yes. Do they belong in a workplace? Maybe not. But are these depictions pictures that attack or say negative things about sexual orientation or sex stereotyping? No, they don't. Even Muscle Beach, if you look at it, it's a childish thing where there's a bunch of people and they just took heads and put them on other people's heads. Now, they make a big deal that Mr. Christensen's head was put on a body of a woman, but other men were put on bodies of women, too. It's just... Not just put on a woman, put on a woman who's laying on her back with her legs up in the air. The other man in the picture was put on a woman whose arms are around a man. Those pictures are... That is the picture of the offense. But you can't put it aside, because you have to look at that picture and the complaint in its totality. Counsel, maybe you don't find it offensive, but wouldn't that be offensive to the average person? It depends on the... I didn't say that I didn't find it offensive or that I did. However, everything depends on context. And the context of this Muscle Beach picture is clearly not intended to discriminate against any group. It's not. Counsel, the context is that your client continuously threw these offensive pictures of appellant and others in the workplace. You're arguing today to this court that under the totality of the circumstances, that isn't something that creates a hostile work environment? I believe that what you said is not accurate, that it was continual. The depictions are in the record. And if you look at the depictions, you look at... I'll go to them, Counsel. So there's nothing sexual or sexual orientation or anything about, even arguably, about the first two. And yes, there is a penis in the third one, but it doesn't appear to be related to sexual orientation. And if anything, as the district court said, it depicts Mr. Christensen as masculine in all these pictures. And it's not an attack on sexual orientation just because it is childish and is something that should probably not be in the workplace. Certainly, it's far from ideal, to say the least. Let me bring you back also to some of the Supreme Court's precedents. You've got Price Waterhouse. Isn't the prohibition, Price Waterhouse's prohibition on the basis of sex stereotypes prohibit discrimination on the basis of sexual orientation, in your view? Well, Price Waterhouse, as Ms. Lask said, dealt with masculinity and femininity. It dealt with a woman who wasn't wearing makeup and who wasn't dressing up as what people thought a woman should dress up as. And is that something that can be distinguished from sexual orientation? Yes, it is. And if you look at masculinity and femininity, it can be something that's viewed as different. I also, since my time's up, do want to point out one other thing. It can be viewed as different, but does it mean that it can't be viewed as covered by Price Waterhouse? The courts have not, as of now. How you choose to view it is going to be up to this court. But as of now, the court's precedents hasn't viewed it that way. What about on Collie? Justice Scalia's observation, which I noted earlier, your adversary, that statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils. And it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. My response to that is that, as I said in my brief, I think it's disgraceful and offensive that Congress hasn't acted to correct this hole in the law. But Congress is well aware of the hole in the law, and Congress has not acted to correct the hole in the law, despite numerous attempts to do so. And I think this court previously and other courts have chosen not to ignore the fact that that hasn't been passed. Again, I can't say how strongly I personally feel that that law should be enacted, and it is upsetting to me personally and should be probably upsetting to everybody. Is that hole in the law just a hole in the judicial interpretation of the law? The hole in the law exists because they keep trying to pass it, and they don't pass it. The ADA is a perfect example. The ADA was a hole in the law, and Congress fixed it. And I also just want to mention one more thing about this brief. There are lots of reasons that explain congressional inaction. It's not necessarily opposition. The point is, sometimes it's hard to make the case one way or the other definitively. I understand. The question is, going back to the formulation on Carl, statutory provisions often go beyond the principal evil to cover reasonably comparable evils, and whether discrimination on the basis of sexual orientation is one of those comparable evils. I agree with Justice Scalia's position that laws should address comparable evils. It'll be up to this court to decide whether or not that's the case. But quite frankly, I don't think this is the right case for that. You have five acts here that occurred over a three-year period well outside the statute of limitations. And as to Facebook... I'm hearing you say that as a matter of legal interpretation, you think it is a comparable evil. I think you're hearing me try to avoid answering the question, Your Honor. I'd be grateful for an answer. Can you ask it squarely, and I'll do my best to. Your Honor, you said that you agreed with Justice Scalia's formulation that statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils. Do you think that discrimination on the basis of sexual orientation is such a comparable evil? I think that it's an evil, and I think that it shouldn't exist. That's my response. So you're saying it is a comparable evil? I'm saying that I think it's an evil, and that it shouldn't exist. And that, unfortunately... So do you disagree with... If I say that you are saying that it is a comparable... You think it is a comparable evil, am I misstating your position? I'm not sure. I'm not sure. I don't think it should exist in the law, and I think it should be remedied through the legislative process. But I do want to mention... The discrimination does not fall within the text of Title VII. Sexual orientation discrimination is a moral wrong, but it is not within the text of the statute. It's definitely not in the text, and it's unfortunate that it's not in the text, and I wish it was, but it's not. Can I ask you, though, because this panel is bound by our precedent, so within the scope of our precedent, we have recognized sexual stereotyping as a claim, and your adversary said this morning that she has not abandoned a sexual stereotyping claim. The district court found that it wasn't adequately pled, but I'm not sure that the court was right about that. Could you address that? Yeah, I would like to address that, because that, again, goes back to this concept of, although there are a lot of allegations in the complaint, the district court did a very good job of taking that complaint and boiling it down to its essence, which was that there are a number of depictions, all of which are in the record, and that there were two comments. Now, the comments, I don't even know that they relate to that depiction, which goes back, I guess, to the continuing violation theory, but again, the comments don't relate to sex stereotyping. Nobody said that Mr. Christensen was feminine or anything that relates to sex stereotyping in any way with respect to him, and the depictions don't show him as feminine, except in the Muscle Beach photo, which, if you look at it in context, and look, the district court flat out said, or basically said, I don't want to find the way that I am finding, but it would be logically disingenuous for me to find otherwise when I look at the totality of the circumstances and the totality of the allegations. And when you look at the totality of the few things that were allegedly done, despite a lot of things being thrown at the wall here, which the district court did a good job at, they're all outside of the statute of limitations, they're all unconnected, and as to Facebook, I'd like to point out that Ms. Lesk said a lot of things up here that I just looked at the complaint again to confirm that I don't see the stuff about tagging or not tagging alleged in the complaint, and what I also don't see alleged in the complaint is that Mr. Christensen asked Mr. Cianciato to remove it from Facebook. That's not alleged in the complaint. So, I don't know how you hold the company responsible for somebody posting something on Facebook and somebody else seeing it allegedly for the first time years later, and the employee was never asked directly to take it down from Facebook, according to what I think I read in the complaint, and I was just looking at it now, so maybe something's buried somewhere that I didn't see, but I did look in the section that related to Facebook, and I don't see those allegations in there. Thank you. Thank you. Rick. You'll have three minutes in rebuttal. Has anybody noticed that the firm that was just standing here talking was the same firm that argued for Symington back in 2000? Today, they're taking a completely different position that they're arguing against what they argued for in Symington. That doesn't mean anything. Well, I just wanted to respond to the anyone could pay a doctor to say anything. That wasn't our style. That's not what happened. Sometimes, maybe anyone could pay. Please stick to the substance. Sticking to the substance, Your Honors. The statute of limitations, again, is the discovery, as I said, and it's upon discovery. We stick with that. The judge in the lower court was, as the justice judge noted, there was two things on timeliness. One was on the disability thing, which I gave the law that the court shouldn't, they can't act as medical doctors. You can't. That's an issue of fact. Today, we're here on the four corners. The lower court never decided on the statute of limitations, and it was not argued below. The pictures are all sexual, almost the same kind of pictures as in Symington that were found reprehensible. It wasn't just pictures, Your Honor. It was accusing him of being a poof, if I'm saying it right, or poof, poof, sissy, having AIDS just because he's gay. All of those things happen. Oh, I have a lot of time left. Okay, so going back to ... Does the court have any questions for me? Oh. Then I would ask this court, please, to revisit Symington and vacate it because that's what was withholding the lower court from going forward. The judge looked at everything and did find the sexual animus and would have gone in our favor, as she states. As you know, we're bound by our precedent. Are you arguing that there is something in the EEOC's action that would give us an authority to revisit Symington, or are you just saying you hope in the course of time that this court as a whole will revisit that precedent? I said it in my brief. I took a bit of a stretch and I said the Symington case actually involved a public worker. It was a public case under 2000-E. There's two sections, public and private. Now that we have the EEOC, plus a wealth of cases, again, Boutelier, Scott Medigol, and everything else, and even for Hively to vacate themselves immediately and revisit this, I think the EEOC has much precedence, more than anybody could say in this Symington case. This court has to look at the agency that is authorized and organized to protect Title VII. That's telling us Symington shouldn't have happened. In the public sector, it certainly could extend to the private sector. So Symington might not even be law according to, oh boy, I just took that too far, but I will say it, according to the EEOC's Baldwin case. It really doesn't stand. Thank you. Thank you, Your Honors. Thank you all for your good arguments. The court will reserve decision.